UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. PECANIC,<br><br>        Bringing this Action On Behalf of the United States of America,<br><br>    v.<br><br>SUMITOMO ELECTRIC INTERCONNECT PRODUCTS, INC., et al.,<br><br>        Defendants. | Civil No. 12-cv-0602-L (NLS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT AND GRANTING MOTION TO STRIKE SECTION VII FROM SECOND AMENDED COMPLAINT [doc. # 27]** |

On May 31, 2011, the United States declined to intervene in this *qui tam* action on its own behalf. (doc. #8.) Accordingly, on June 8, 2011, Relator Robert Pecanic, Jr.'s First Amended Complaint was ordered unsealed. (doc. # 9.) On January 17, 2012, Relator filed his Second Amended Complaint ("SAC") against Sumitomo Electric Interconnect Products, Inc.; Sumitomo Electric Fine Polymer, Inc.; Chris Foeger; Nobuyoshi Fujinami; and Jon Mills ("Defendants"). (doc. #22.) Relator seeks damages on behalf of the United States for Defendants' alleged violations of the False Claims Act ("FCA"), §§3729, *et seq.* (SAC ¶ 2.) Defendants move to dismiss the SAC pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) on the grounds that Relator does not plead fraud with the required particularity and fails

to state a claim upon which relief can be granted. (doc. #27.) In the alternative, Defendants also move to strike a portion of the SAC. (*Id*.) The motion has been fully briefed, and the Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d.1). (doc. #48.) For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss the SAC and to strike Section VII from the SAC.

**I.     BACKGROUND**

Relator Robert Pecanic is a former sales representative of Defendant Sumitomo Electric Interconnect Products, Inc. ("SEIP"). (SAC ¶ 3.) SEIP is a California corporation located in San Marcos, California. (*Id*. ¶ 4). SEIP is also a wholly-owned subsidiary of Defendant Sumitomo Electric Fine Polymer, Inc. ("SFP"), which is based in Osaka, Japan**.** (*Id*. ¶¶ 4-5.) The remaining Defendants hold or held various senior management positions within these two companies. Defendant Chris Foeger is the current national sales manager and former president and CEO of SEIP, whereas Defendant Nobuyoshi Fujinami is the current president and CEO of SEIP. (*Id. ¶¶* 8, 9.) Mr. Fujinami also previously worked for SFP prior to taking over at SEIP in February 2010. (*Id*.) Lastly, Defendant Jon Mills is a former employee of SEIP who was the product manager for the division that manufactured the shrinkable wire tubing products underlying this case. (*Id. ¶* 7.)

Relator alleges that these Defendants "knowingly made, and caused to be made, false claims, certifications and statements in order to obtain payments under government contracts for military specification electrical products." (SAC *¶* 2.) Specifically, Relator asserts that false claims and certifications were made to the United States regarding two groups of products sold by SEIP. The first group of products includes all variations of the "Sealed Crimp Slice Kit" ("Crimp Splice"), which is used to "create an environmentally sealed 'splice' connecting the ends of two electric wires." (*Id*. *¶¶* 24, 26.) "A crimp splice consists of a short metal 'crimp barrel' inside a shrinkable plastic 'insulation sleeve' with a meltable 'sealing ring' at either end." (*Id*. *¶* 26.) The second group of products encompasses all variations of SEIP and SFP's "Solder Termination Sleeve" ("STS") products. (*Id*. *¶* 29.) An STS is also used to create an

"environmentally sealed connection" between two wires by connecting a shielded wire with a "second 'lead' wire that will be connected to the ground." (*Id*. ¶ 30.)

These two families of tubing products were sold by SEIP and SFP to the United States and government contractors for use in military aircraft, weapon systems, and other applications. (SAC ¶ 37.) Relator contends that the Crimp Splice and STS products contained a "variety of defects that could lead to catastrophic failure of systems in which they are installed." (*Id*. ¶ 36.) These alleged defects include, but are not limited to, using improper tubing and barrel materials, inserting unapproved adhesives and components, and making "other material deviations" from the required product specifications. (*Id*.)

Before each of these products could be sold to the United States or government contractors, they were required to be tested by Naval Air Systems Command ("NAVAIR") and be qualified for inclusion on NAVAIR's "Qualified Products Lists" ("QPLs"). (*Id*. ¶¶ 50- 51, 54.) This qualification process included providing samples for testing, meeting set standards and military specifications, and certifying that the product conforms to the required specifications based on supplemental testing. (*Id*. ¶¶ 23, 54, 56.) After approval, the manufacturer also must periodically certify that "the listed product is still available from the listed [manufacturing] plant, can be produced under the same conditions as originally qualified, and meets the requirements of the current issue of the specification." (*Id*. ¶ 67.) SEIP and SFP completed this process and obtained approval for the Crimp Splice and STS products to be included on the QPLs. (*Id*. ¶ 68.)

However, Relator alleges that SEIP and SFP's product certifications were false and concealed the aforementioned defects in the Crimp Splice and STS products. (SAC ¶ 22.) These asserted discrepancies in the QPL applications and the certification process include: falsely identifying the San Marcos facility as the manufacturing plant when the products were being produced in Mexico from Chinese parts, (*Id*. ¶¶ 72, 77-78.), concealing the true origin of the products by using removable "Made in Mexico" stickers, (*Id*. ¶¶ 74-75.), skewing the testing process by selecting components that appeared most likely to pass inspection, (*Id*. ¶ 92.), and improperly color coding the Crimp Splice components (*Id*. ¶¶ 153, 155.) Relator repeatedly

brought his concerns about these discrepancies to the attention of management over the course of several years. (SAC ¶¶ 114, 156, 223, 247, 266.) Yet, management allegedly ignored Mr. Pecanic's complaints, did not address the underlying issues, and threatened to terminate him. (*Id.* ¶¶ 199, 217, 248, 284.) Ultimately, Relator refused to continue selling the allegedly defective products and was eventually terminated. (*Id.* ¶¶ 288-89.)

Out of these allegations, Mr. Pecanic asserts the following separate counts under the FCA: violations of 31 U.S.C. § 3729(a)(1)(A), violations of 31 U.S.C. § 3729(a)(1)(B), violations of 31 U.S.C. § 3729(a)(1)(G), violations of 31 U.S.C. § 3729(a)(1)(c), violations of 31 U.S.C. § 3729(a), and violations of 31 U.S.C. § 3730(h). Mr. Pecanic's Count VI is not a separate cause of action because 31 U.S.C. § 3730(c)(5) contains an alternative remedy provision that is only appropriate when the U.S. Government has recovered damages.

Defendants move to dismiss all of Relator's counts under Rule 9(b) of the Federal Rules of Civil Procedure because the SAC does not plead fraud with the requisite particularity. (Defs' Mot. Dismiss 2-7.) Defendants additionally move to dismiss with prejudice Counts III, IV, V, VI, and VII under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the basis that these counts fail to state claims for which relief may be granted. (*Id.* 7-15.) Defendants further move to strike paragraphs 182-84 of the SAC because those allegations are irrelevant and highly prejudicial to Defendants. (*Id.* 15.) In response, Relator opposes and also requests judicial notice of several documents regarding product specifications underlying his claims. (doc. #39.) Lastly, in reply, Defendants request judicial notice of additional similar records. (doc. #41.) The Court **GRANTS** Relator and Defendants' requests for judicial notice.[1]

## II.   DISCUSSION

### A.   False Claims Act

The False Claims Act (FCA) imposes civil liability upon "[a]ny person" who "knowingly

---

[1] The Court grants each request under Federal Rule of Evidence 201(b). Plaintiff's request includes four documents that are all records of federal administrative bodies. Defendants' request similarly contains aerospace material specifications that have been formally adopted by the Department of Defense. Accordingly, judicial notice of each of these documents is permitted under the rule allowing judicial notice of records and reports of administrative bodies. *Anderson v. Holder*, 673 F.3d 1089, 1094 n.2 (9th Cir. 2012).

presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). Persons who do so are liable for civil penalties of up to $10,000 per claim and treble damages. *Id.* An FCA action may be commenced in one of two ways. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 412 (2005). First, the Government may bring a civil action against the alleged false claimant. 31 U.S.C. § 3730(a). Second, a private person, known as a "relator," may bring a *qui tam* civil action on behalf of the United States Government against the alleged false claimant. *Id.* § 3730(b). Additionally, the FCA provides a "cause of action for an individual retaliated against by his employer for assisting an FCA investigation or proceeding" as a supplemental enforcement mechanism. *Graham*, 545 U.S. at 412 (citing 31 U.S.C. § 3730(h)).

Once a *qui tam* action is initiated, the Government receives a copy of the complaint and is given sixty days to intervene in the action. 31 U.S.C. § 3730(b)(2), (4). If the Government declines to intervene, as was done in this case, the relator has the exclusive right to conduct the action on the Government's behalf. *Id.* § 3730(b)(2). If successful, the relator is entitled to receive twenty-five to thirty percent of the action or settlement proceeds in addition to attorney's fees and costs. *Id.* § 3730(d)(1).

Under this framework, an FCA claim "can be based on the allegation that a party has falsely certified compliance with a statute or regulation as a condition to government payment." *United States v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011) (citing *United States* ex rel. *Hendow v. Univer. of Phoenix*, 461 F.3d 1166, 1168 (9th Cir. 2006)). Yet when invoking this false certification basis, a claim must still be first pleaded with the required particularity for fraud. *Id.* at 991-92. Additionally, in order to state a claim upon which relief may be granted, the essential elements of an FCA claim must also be satisfied. *Id.* at 992.

### 1. Pleading Fraud with Particularity

Relator's claims rest on the false certification theory, and he contends that the SAC pleads violations of the FCA with sufficient particularity. This Court disagrees. Federal Rule of Civil Procedure 8(a) typically governs pleading requirements and requires that a complaint

contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). A complaint must only contain "sufficient factual matter" that, taken as true, "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, a claim sounding in fraud is subject to Rule 9(b)'s heightened pleading requirement that the plaintiff "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). Rule 9(b) requires that allegations of fraud be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)) (internal quotations omitted). To satisfy Rule 9(b), the plaintiff must state the requisite "who, what, when, where, and how" of the misconduct he alleges. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess*, 317 F.3d at 1106) (internal quotations omitted).

*Qui tam* actions under the FCA must satisfy Rule 9(b)'s heightened pleading standard because they involve allegations of fraud. *Corinthian*, 655 F.3d at 992. Under this standard, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Id.* at 997-98 (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007)) (internal quotations omitted). "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum identify the role of each defendant in the alleged fraudulent scheme." *Id.* at 765 (quoting *Swartz*, 476 F.3d at 765).

Here, Relator has not met Rule 9(b)'s threshold requirements by aggregating allegations against multiple Defendants. At the onset, the SAC improperly lumps the separate Defendants SEIP and SFP into a singular term "Sumitomo." Relator explains that "[b]ecause of their close relationship, defendants SEIP and SEFP are sometimes collectively referred to herein as 'Sumitomo,' and in such cases, the singular pronouns 'it' and 'its' are used to avoid confusion." (SAC ¶ 6.) But, throughout the SAC's roughly 270 paragraphs of factual allegations, the term

"Sumitomo" is almost exclusively used to describe the alleged fraudulent conduct. The commingling of these two Defendants renders the SAC unclear as to what was each Defendant's role in the alleged fraud. For example, Relator contends that "Sumitomo made these false certifications each time it submitted a QPL application, each time it submitted a QPL renewal application, and each time it sold these products to the government or a government contractor." (*Id.* ¶ 41.) This allegation's merging of SEIP and SFP's identities obscures discerning which entity is submitting the applications, which is reapplying for certification, and which is selling the products. When this ambiguity is extrapolated to the entire SAC, the result is that the SAC fails to specifically "identify the role of each defendant in the alleged fraudulent scheme." *Corinthian*, 655 F.3d at 984 (quoting *Swartz*, 476 F.3d at 765) (internal quotations omitted). This trend continues within Relator's Opposition, and the lack of particularity persists. (Opp'n 2-9.)

Further, Relator's allegations that SEIP is a wholly-owned subsidiary and that SEIP was at all times subject to SFP's control with respect to these products is insufficient to support alternatively treating the two corporate entities as one. "The mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law." *Katzir's Floor and Home Design, Inc. v. M-MLS.com,* 394 F.3d 1143, 1149 (9th Cir. 2004) (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)). As a parent company, SFP is presumed to have an existence separate from its subsidiaries. *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003). Relator must either properly allege liability for SFP under an alter ego theory or demonstrate that each entity is liable for its own role in the submission of false claims or statements. The SAC fails to do so.

As for Defendants Mr. Foeger and Mr. Fujinami, the SAC similarly does not overcome the requirements of Rule 9(b). Mr. Pecanic asserts that each of these Defendants had "full knowledge of, and directly participated in, false certifications, sale of defective products, and all other fraudulent activity described in this Complaint." (SAC ¶¶ 8-9.) Further, that "[i]n performing all of the acts described herein, Defendants have defrauded the United States by knowingly, willfully, or recklessly presenting, or causing to be presented . . . a false and fraudulent claim." (*Id.* ¶ 291.) Aside from these wholesale allegations, Relator argues that these

two individuals are responsible for the submission of false claims specifically as corporate officers of SEIP and SFP that were aware of the defective products and omitted to take action. (*Id.* ¶¶ 8, 9, 217, 223, 274; Opp'n 20-21.) However, because the SAC fails to sufficiently identify the necessary underlying actions of SEIP and SFP in the alleged fraud, this Court rejects that Relator has provided enough detail to give Mr. Foeger and Mr. Fujinami "notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *United States* ex rel. *Lee* v. *SmithKline Beecham, Inc.,* 245 F.3d 1048, 1052 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993)) (internal quotation marks omitted). Lastly, Defendant Mills was never served in this action and therefore the FCA claims against him will be dismissed as well.

## 2. Failure to State a Claim

Mr. Pecanic does not object to the dismissal of Counts III, IV, V, or VI. (Opp'n 22.) Accordingly, these counts will be dismissed. Defendants contend that the remaining Count VII, for FCA retaliation, should be dismissed as well for failure to state a claim. (Defs' Mot. Dismiss 12-15.) The Court finds that Count VII sufficiently states a claim.

The court must dismiss a cause of action for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court must accept all allegations of material fact as true and construe them in light most favorable to the nonmoving party. *Cedars–Sanai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). Material allegations, even if doubtful in fact, are assumed to be true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But, the court need not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc., 328* F.3d 1136, 1139 (9th Cir.2003) (internal quotation marks omitted). In fact, the court does not need to accept any legal conclusions as true. *Iqbal*, 556 U.S. at 678.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (internal citations omitted). Instead, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. 663 (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

"Congress added 31 U.S.C. § 3730(h) to the FCA in 1986 to protect 'whistleblowers,' those who come forward with evidence their employer is defrauding the government, from retaliation by their employer." *United States* ex rel. *Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996). Under this provision, the FCA protects employees from being "discharged, demoted, . . . or in any other manner discriminated against in the terms and conditions of employment . . . because of lawful acts done by the employee . . . in furtherance of an [FCA] action . . ., including investigation for, initiation of, testimony for, or assistance in an [FCA] action. . .." 31 U.S.C. § 3730(h). The statute provides protection even if the target of the investigation or action to be filed was innocent. *Graham*, 545 U.S. at 416. Therefore, an "an employer does not face liability for the suspected or actual fraud; it faces liability for a retaliatory act against the investigating employee." *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1103 (9th Cir. 2008).

In contrast to *qui tam* FCA actions, FCA retaliation claims are unconstrained by the fraud pleading standard and need only satisfy Rule 8's general pleading standard. *Id*. "A plaintiff alleging a FCA retaliation claim must show three elements: (1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected

activity; and (3) that the employer discriminated against the plaintiff because he or she engaged in protected activity." *Id*. (citing *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir.2002); *Hopper*, 91 F.3d at 1269).

An imperfect complaint containing sufficient facts alleging all three elements of an FCA retaliation is enough to survive dismissal under Rule 12(b)(6). *Mendiondo*, 521 F.3d at 1104. In *Mendiondo*, plaintiff filed an "inartfully drafted" complaint that claimed retaliation under the FCA for investigating certain practices at defendant medical center that were intended to inflate Medicare reimbursements and unsafely cut costs. *Id*. at 1100-01. Mendiondo resisted engaging in these practices, and informed the defendant's CEO that her supervisors expected her to engage in activities that "were below the standard of care" and "could lead to civil and criminal violations." *Id*. at 1101. When she was assigned to a new supervisor, the supervisor demanded that Mendiondo cut costs or be fired and that she follow the suspect practices regardless of her continued objections. *Id*. Mendiondo was subsequently terminated. *Id*. In reversing the district court's decision to dismiss the complaint, the 9th Circuit held that Mendiondo's complaint satisfied all three elements of an FCA retaliation claim. *Id*. at 1105. The court reasoned that the first element of engaging in protected activity was satisfied because the complaint contained examples of specific practices at the medical center that Mendiondo was investigating and suspected to be fraudulent. *Id*. Additionally, the complaint satisfied the second element because, although her statements to management about possible civil violations were "vague," this reference to civil violations could be construed to include the suspected fraud. *Id.* Lastly, Mendiondo's claim that the defendant terminated her "because of her investigation into facts relating to" the "submission of false claims" was enough at the pleading stage to satisfy the final requirement because she provided notice that she believes the defendant terminated her for investigating the practices alleged in the complaint. *Id* (citing *Edwards* , 356 F.3d at 1061); *compare, with Hopper*, 91 F.3d at 1268-70 (holding district court erred in refusing to grant motion for judgment as a matter of law when the "entire record" failed to demonstrate that Hopper was engaged in a protected activity in furtherance of the FCA).

Here, Mr. Pecanic's complaint sufficiently states a claim for FCA retaliation under the

Rule 8 standards and Rule 12(b)(6)'s requirements. To start, the complaint contains various examples of practices and defects that Mr. Pecanic asserts he believed were leading to false or improper product certifications. (SAC ¶¶ 72, 74-75, 77-78, 92, 140-41, 153, 155.) Mr. Pecanic investigated these events by confronting employees, discussing with third parties the products' failure to conform with required standards, and assisting government investigators. (*Id.* ¶¶ 216, 238, 262, 275, 330.) These allegations suffice to show that Mr. Pecanic was engaged in a protected activity by investigating conduct that a person in his situation could reasonably believe was leading to fraud being perpetrated against the government. *See Moore*, 275 F.3d at 845 ("[S]pecific awareness of the FCA is not required, but the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." (*quoting Hopper*, 91 F.3d at 1269) (internal quotations and alterations omitted)).

Additionally, the SAC sufficiently alleges that Mr. Pecanic's employer knew he was engaged in a protected activity. Specifically, other than his numerous complaints about the alleged problems, Mr. Pecanic claims that he informed management that he had been gathering "documentation and evidence" that showed the failure of products that were underlying the alleged false certifications in this case. (*Id.* ¶¶ 284, 286.) Mr. Pecanic also informed executives that the business was "mandated by the QPL approval to immediately contact NAVAIR, so that an official recall and investigation into the QPL-approved parts could commence" and that the business take the "legal and specified actions" to correct the improper procedure. (*Id.* ¶ 268.) Albeit more tenuous, the SAC under Rule 8 also meets the second pleading requirement because his complaints and statements to management can be construed to include his investigation of suspected false claims and certifications. *See Mendiondo*, 521 F.3d at 1104 (holding that a vague reference to management that can be construed to include the suspected fraud is sufficient at the pleading stage).

Finally, Mr. Pecanic satisfies the final pleading requirement for a retaliation claim by alleging that he was retaliated against "solely because of his opposition and objections to Sumitomo's unlawful practices." (SAC ¶ 343.) Mr. Pecanic states that he was subjected to ongoing retaliation including a threats of termination and a hostile work environment, and that

he has also since been terminated. (*Id.* ¶¶ 279, 280, 288, 289, 340.) In reply, Defendants pinpoint their assault on this element, contending that Mr. Pecanic's statements are "completely contrary to the allegations in the SAC" and that "Relator consistently alleged in the SAC that he was terminated because he refused to sell certain products and kept raising quality and safety issues with management." (Defs' Reply 7-8.) However, under Rule 8's requirements, this Court is not convinced that Mr. Pecanic has failed to state a claim because he included in his complaint that he was both retaliated against for investigating fraudulent practices and terminated for refusing to sell the products underlying these practices. "It suffices at this pleading stage" for Mr. Pecanic to simply give notice that he believes Defendants retaliated against him because of his "investigation into the practices []he specified in the complaint." *Mendiondo*, 521 F.3d at 1104. Because Mr. Pecanic has sufficiently pled all three of the requirements for an FCA retaliation claim, the Court **DENIES** Defendants' motion to dismiss Count VII.

### 3.     Leave to Amend

This Court also grants Mr. Pecanic leave to amend his complaint. Rule 15(a) of the Federal Rules of Civil Procedure provides that after a responsive pleading has been served, a party may amend its complaint only with the opposing party's written consent or the court's leave. FED. R. CIV. P. 15(a). "The court should freely give leave when justice so requires," and apply this policy with "extreme liberality." *Id.*; *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). However, leave to amend is not to be granted automatically. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (citing *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990)). Granting leave to amend rests in the sound discretion of the district court. *Pisciotta v. Teledyne Indus.,* 91 F.3d 1326, 1331 (9th Cir. 1996).

The Court considers five factors in assessing whether to grant leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of the amendment, and (5) whether the plaintiff has previously amended the complaint. *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). The party opposing amendment bears the burden of showing any of the factors above. *See DCD Programs*, 833 F.2d at 186. Of these factors, prejudice to the opposing party carries the greatest weight. *Eminence*

*Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). However, absent prejudice, a strong showing of the other factors may support denying leave to amend. *Id*.

Defendants contend that Relator's complaint must be dismissed with prejudice because "Relator has amended his complaint twice and remains unable to plead any actionable claims," and that "[t]here is no reason to suppose a third try will change this result." That Mr. Pecanic has already amended his complaint twice is insufficient to overcome the liberal standard under Rule 15(a). The Court does not find this factor particularly persuasive considering that one of these amendments occurred prior to the case being unsealed. This Court also does not believe further amendment would be futile. Mr. Pecanic can correct his SAC's primary deficiency by clearly stating each Defendants' role in the alleged fraud with the required particularity. Specifically, Relator could individualize the factual allegations regarding "Sumitomo" and instead state how each SEIP and SFP submitted or caused to be submitted false claims or statements. Relator must be able to accomplish this without blurring their separate corporate forms. Mr. Pecanic would at the same time benefit from condensing his voluminous complaint. Consequently, Mr. Pecanic is granted leave to amend his complaint. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (noting that a court should permit amendment "unless it determines that the pleading could not possibly be cured by the allegation of other facts" (internal quotation marks and citation omitted)).

**B.     Motion to Strike**

Lastly, the Court considers Defendants' motion to strike paragraphs 182, 183, and 184 from the SAC. The Court agrees that these paragraphs should be stricken. Rule 12(f) provides that a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). Motions to strike are generally disfavored because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice. *See Rosales v. Citibank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001); *Bureerong v. Uvawas*, 922 F.Supp. 1450, 1478 (C.D. Cal. 1996). A federal court will not exercise its discretion under Rule 12(f) to strike a pleading unless the matters sought to be omitted have no possible relationship to the controversy, may confuse the issues, or

otherwise prejudice a party. *Id.* Ordinarily a motion to strike will not be granted unless "the matter to be stricken clearly could have no possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F.Supp.2d 1048, 1057 (N.D. Cal. 2004). "Motions to strike are rarely granted in the absence of a showing of prejudice to the moving party." *Freeman v. Alta Bates Summit Med. Ctr. Campus*, 2004 WL 2326369, at *2 (N.D. Cal. 2004) (citing 61 Am. Jur. 2d Pleading § 505 (West 1999)). Matters may be stricken to reduce trial complication or if challenged allegations are so unrelated to plaintiff's claims to be unworthy of consideration as a defense and their presence in the pleading will prejudice the party seeking to strike matters. *Fantasy, Inc., v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993). When considering a motion to strike, the court "must view the pleading in a light most favorable to the pleading party." *In re 2TheMart.com, Inc.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000).

Defendants argue that paragraphs 182, 183, and 184 of the SAC should be stricken because the allegations are irrelevant, inflammatory, and prejudicial. (Defs' Mot. Dismiss 16.) The SAC in paragraphs 183 and 184 reads:

> "A particular chilling example of the type of catastrophic failure that could result from the defects described in herein is the June 1, 2009 crash of Air France flight 447 . . . Although there is no evidence to date that any of Sumitomo's STS or Crimp Splice products were installed on flight 447, the type of failure the aircraft experienced is exactly the type of problem that could be caused by an improperly grounded system due to a bad STS, or a defective splice that had either come loose, or poked through the Kynar sleeve to contact a metal surface. . ."

Relator responds that these allegations are relevant to the "materiality" element of Count II of the SAC. (Opp'n 25.) Meaning, the statements support that the false certifications here were material, or in other words capable of influencing the U.S. Government, on the basis that the products would not have been purchased by the United States unless they were certified as complying with required specifications. The asserted connection to these allegations is that the defective products in this case would not have been acquired without a false certification because of their potential to cause an airplane to crash. Relator takes this argument one step further by including the crash of the Air France Flight 447 on June 1, 2009, which caused 228 fatalities, as a concrete example of such a product failure.

Although Relator is entitled to allege why the alleged false statements were material, the

Court agrees with Defendants that the example of a catastrophic commercial plane crash is prejudicial to them in this case. Relator admits that "there is no evidence to date that any of Sumitomo's STS or Crimp Splice products were installed on flight 447." (SAC ¶ 184.) There are also no allegations in the SAC that Defendants sold products to Air France or that they were installed on similar commercial aircraft. Additionally, these allegations have the potential confuse the issues in this case. The crux of Relator's claims is that Defendants made or caused false or fraudulent claims to be presented to the United States for payment, not that Defendants are civilly liable because they produced products that are so dangerously defective as to potentially cause commercial airlines crashes. Therefore, the Court finds that the references to Air France Flight 447 are unduly prejudicial and that the allegations are to be stricken from the SAC.

## III. CONCLUSION

For the reasons set forth above, **IT IS ORDERED**:

1. Defendants' motion to dismiss for failing to plead fraud with particularity as to Counts I and II is **GRANTED WITH LEAVE TO AMEND;**

2. Defendants' motion to dismiss for failure to state a claim as to Counts III, IV, V, and VI is **GRANTED WITH PREJUDICE**;

3. Defendants' motion to dismiss for failure to state a claim as to Count VII is **DENIED**;

4. Defendants motion to strike Section VII from the Second Amended Complaint is **GRANTED**;

5. If Plaintiff intends to file a Third Amended Complaint in conformity with this Order, he must do so on or before March 15, 2013.

**IT IS SO ORDERED.**

DATED: February 28, 2013

M. James Lorenz
United States District Court Judge

///

1  COPY TO:

2  HON. NITA L. STORMES
   UNITED STATES MAGISTRATE JUDGE
3

4  ALL PARTIES/COUNSEL